IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KENNIKA L. TOLLIVER-CROMWELL,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 09-303-JPG** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Kennika L. Tolliver-Cromwell seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI) pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

Plaintiff filed an application for DIB and SSI on September 14, 2005, alleging disability beginning on July 22, 2005. (Tr. 14, 31). She claims disability due to headaches caused by pseudotumor cerebri and back pain, along with depression. (Tr. 148, 1113). "Pseudotumor cerebri is a disorder consisting of cerebral edema with narrowed small ventricles

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

-1-

but with increased intracranial pressure. Edema is an accumulation of an excessive amount of watery fluid in cells or intercellular tissues." **Doc. 12, p. 2**.

Plaintiff was insured for DIB through September 30, 2008. (Tr. 107).

After the application was initially denied, a hearing was held before Administrative Law Judge (ALJ) J. Pappenfus on November 27, 2006. (Tr. 1107-1125). ALJ Pappenfus denied the application for benefits in a decision dated April 26, 2007. (Tr. 31-40). On plaintiff's request for review, the Appeals Council remanded with directions to obtain evidence from a vocational expert. (Tr. 79).

A second hearing was held on May 20, 2008, before ALJ Robert G. O'Blennis. (Tr. 1126-1161). ALJ O'Blennis denied benefits in a decision dated July 21, 2008. (Tr. 14-24). The Appeals Council denied review, and this decision became the final agency decision. (Tr. 6).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff argues that the ALJ's decision denying her benefits was not supported by substantial evidence in that:

1. The ALJ's determination of plaintiff's RFC was erroneous in that it was not supported by medical evidence and the ALJ did not set forth a narrative discussion of how he arrived at his determination.

2. The ALJ failed to give proper weight to the opinions of plaintiff's treating doctors, Dr. Temporal and Dr. Kinsella.

3. The Commissioner erred in failing to properly analyze the report of Dr. Nalagan, which was submitted to the Appeals Council as "new and material evidence" after the July 21, 2008, decision had been rendered.

**The Evidentiary Record**

The court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.      Plaintiff's Testimony**

In the July 21, 2008, decision, ALJ O'Blennis stated that he reached his conclusions based on a review of all of the evidence, including the testimony at the first hearing. See, Tr. 15.

Plaintiff was represented at both hearings by attorney Brigid McNamara. (Tr. 1109, 1128). Ms. Tolliver-Cromwell was born on April 22, 1983. (Tr. 1130). She graduated from high school, and has no vocational or technical training. (Tr. 1111). She was pregnant at the time of the first hearing. (Tr. 1110).

At the time of the second hearing, May 20, 2008, plaintiff weighed 287 pounds. (Tr. 1142). At that time, her children were aged three and one. (Tr. 1130).

Plaintiff last worked at McDonald's, first as a crew member and later as a crew trainer. That was her only job of any length. She left that job in August of 2005 because of headaches. (Tr. 1131-1133).

At the time of the second hearing, plaintiff was taking Topamax for headaches and Diamox to reduce swelling in her eye. She also was taking Nortriptyline at bedtime and using an Albuterol inhaler as needed. She was also taking over-the-counter Excedrin as needed for headaches. (Tr. 1134-1135). When asked about side-effects, she testified that Topamax causes short-term memory loss. (Tr. 1137).

Her primary care physician as of May 20, 2008, was Dr. Michael Temporal. (Tr. 1133). She still saw Dr. Lawrence Kinsella, a neurologist, occasionally. (Tr. 1132). She also saw a

neurosurgeon at St. Louis University Hospital, and Dr. Chung, who is an ophthalmologist. (Tr. 1133-1134).

ALJ O'Blennis asked plaintiff to describe her daily activities. She testified that she usually goes to bed around 10:00 p.m., and gets up around 8:00 a..m. She is usually "just taking care of the kids," which entails feeding them breakfast and then turning the television on so they can watch it. She sits with them, unless she has a headache. If she has a headache, she lays down in a dark room. (Tr. 1135-1136).

Plaintiff is able to cook as long as it not something that she has to stand and watch. (Tr. 1138). She does not do laundry because it is too heavy. She can do grocery shopping if she can lean on the cart, but, if her back starts to hurt, she has to sit down and her husband finishes the shopping. (Tr. 1139). Her husband does the housework. (Tr. 1143).

Ms. Tolliver-Cromwell testified that she leaves her home only to go to the store or to the doctor. She does nothing other than take care of her kids, type an e-mail maybe once a week, and visit her friend in Belleville once or twice a month. (Tr. 1143-1144).

Her primary care doctor has recommended she lose weight. She has tried without success to locate a dietician who will take her insurance. She has tried diets on her own but they have not worked. (Tr. 1139). Her doctor suggested a dietician because exercise would be painful for her back. (Tr. 1141).

Plaintiff testified that she cannot work because of headaches and back pain. She has headaches maybe two times a week. The headaches vary in length. Her back pain is caused by two herniated discs, which she has had since March, 2006. She has not been able to get a referral to a back specialist who accepts her insurance. Her insurance is through Illinois Public Aid. (Tr. 1144- 1146).

Plaintiff testified that her back is getting worse and she has difficulty in personal

grooming and taking showers. She has not asked her doctors for prescription medicine for her back. Over-the-counter medicine has not helped her back pain. (Tr. 1146-1147). She can sit or stand for only fifteen to twenty minutes at a time due to back pain. Over an eight hour period, she could sit for a total of only two hours, and could stand for a total of two and a half hours. She can walk only a block. (Tr. 1149-1150).

Plaintiff's headaches vary in length from two hours to all day. She sits in a dark, quiet room when she has a headache. (Tr. 1150).

Dr. Temporal has also seen her for depression caused by the loss of a pregnancy in January, 2008. He increased her dosage of Nortriptyline and referred her to a counselor, but she has not been able to see a counselor because she cannot find a one near her home who takes her insurance. (1152). Dr. Temporal has not referred her to a psychiatrist. (Tr. 1154).

**2.     Testimony of Vocational Expert**

Vocational Expert Brenda Young testified at the second hearing. Plaintiff had no objections to her qualifications. (Tr. 1155).

Plaintiff's past work as a crew member at McDonald's was light and unskilled. Her past work as a crew trainer was light and at the low end of semi-skilled. She worked as a cashier for one summer at Wal-Mart, which was light and at the low end of semi-skilled. (Tr. 1156).

ALJ O'Blennis asked Ms. Young to assume a RFC of less than a full range of light work, i.e, ability to lift 20 pounds occasionally, sit for 6 hours out of 8, stand and/or walk for 6 hours out of 8, with limitations of no work at unprotected heights, no overhead work, only simple and/or repetitive work and no close interaction with the public or co-workers. The VE testified that a person with that RFC would be able to perform the work of file clerk (2,000 jobs) and cafeteria helper (4,500 jobs). (Tr. 1157).

In addition, the VE testified that a person with a RFC of an ability to do less than a full

range of sedentary work, would be able to perform the work of sedentary assembler (2,500 jobs). (Tr. 1158). Removing the limitation of no close interaction with the public would open up customer service jobs (10,000 jobs). (Tr. 1159). Adding a sit/stand option would add the jobs of telemarketer (4,500 jobs) and cashier (Tr. 700 jobs). (Tr. 1159).

Ms. Young testified that the RFC indicated by Dr. Temporal's medical source statement, located at Tr. 1066, would preclude competitive employment on a full-time basis. (Tr. 1159).

### 3.    Medical Records - Dr. Laurence Kinsella

Dr. Kinsella is a neurologist who treated plaintiff through Forest Park Hospital in St. Louis, Missouri. He saw her beginning in September, 2005. She gave a history of "intractable daily constant headaches beginning in June, 2005." (Tr. 803). She then had three lumbar punctures and was started on Diamox. By the time Dr. Kinsella saw her on September 14, 2005, she had improved such that her headaches occurred around 10:00 p.m., and she had to take 3 Excedrin so that she could sleep. She did not have headaches on awakening. She had been recently seen by Dr. Greuloch at the Anheuser Busch Eye Institute, who found some loss of vision in her right eye. An MRI from August, 2005, showed tight ventricles, normal open sagittal sinus, and small left acoustic neuroma. Dr. Kinsella felt the neuroma was asymptomatic, but referred plaintiff to a neurosurgeon for further evaluation. Regarding her headaches, Dr. Kinsella's impression was that they were a mix of migraines, analgesic rebound headaches, and increased intercranial pressure headaches. The fact that the headaches happened in the evening and not upon awakening was noted to be "atypical" for increased intercranial pressure headaches. Dr. Kinsella recommended that she discontinue all over-the-counter pain relievers, and begin taking Topamax. (Tr. 803-806).

On November 22, 2005, plaintiff told Dr. Kinsella that she was having headaches only once a week, but she was having visual disturbances. The doctor's impression was

"pseudotumor cerebri versus migraine." He increased the dosage of Diamox and reduced the dosage of Topamax because Topamax can cause cognitive dysfunction. He instructed plaintiff to make an appointment with Dr. Greuloch, an ophthalmologist, to evaluate her visual complaints. (Tr. 801-802).

The next visit was on February 8, 2006. Dr. Kinsella noted that she had been seen by Dr. Greuloch in January, 2006, and that her color vision was decreased, but her acuity was unchanged. She had gained 15 pounds and weighed about 276 pounds. Plaintiff told Dr. Kinsella that she had developed back pain a month earlier when she developed "a heart beat on my spinal cord." (Tr. 797). The back pain caused her to be hunched over, but she had no tingling, paresthesia, weakness in the legs, or radicular component. Her pain was relieved with sitting. With regard to her headaches, she reported that she was having headaches about once a week. The headaches occurred around mid-day and were associated with nausea and photophobia. Dr. Kinsella concluded that her back pain was musculoskeletal, and there was no evidence of disc herniation or epidural lipomatosis. He felt that her headache was mostly "common migraine" and continued her on Topamax. He recommended a lumbar puncture to relieve spinal fluid pressure. (Tr. 798-799).

On June 28, 2006, plaintiff told Dr. Kinsella that she was four months pregnant and had stopped tkaing all anti-migraine medicaiton. She was having daily headaches, and was taking large amounts of Tylenol. The doctor thought she was having analgesic rebound headaches, and migraine without aura. He again recommended that she discontinue Tylenol, but told her she could use Migrelief and other herbal supplements while pregnant. (Tr. 795-796).

Dr. Kinsella saw plaintiff on November 21, 2006, at which time she was about 36 weeks pregnant. She complained "mainly of pregnancy-associated discomfort in the back and hips." (Tr. 993). She was described as a "morbidly obese African-American woman in no acute

distress." (Tr. 993). She reported having headaches every other day, for which she was again taking Tylenol. Dr. Kinsella found normal venous pulsations. He again felt that most of her headache was due to overuse of analgesics such as Tylenol. (Tr. 994).

On June 13, 2007, Dr. Kinsella noted that plantiff had delivered her baby in December, 2006, and had worsening headaches since then. She was taking Diamox, Topamax and Tylenol. Her headaches developed in the afternoon and persisted until bedtime. She did not have visual loss, but did have photophobia and nausea and vomiting. He did not see any "active pseudotumor cerebri." He again felt that her headaches were due to the overuse of medication, and again told her to discontinue Tylenol. She was to increase the dosage of Topamax. Dr. Kinsella prescribed Zanaflex for 2 to 3 weeks to help her withdraw from Tylenol. (Tr. 995-996).

**4.**     **Medical Records - Dr. Michael Temporal, Belleville Family Practice**

Dr. Temporal is plaintiff's family doctor. The transcript contains records from 2007 and 2008.

The earliest record from Dr. Temporal is dated May 21, 2007. Ms. Tolliver-Cromwell's main complaint was headaches. She also complained of "lower back discomfort when headaches worse." The doctor noted that she had been diagnosed with pseudotumor cerebri and had undergone spinal taps. He also noted that she was unable to have a shunt placed due to her obesity. He discussed the importance of starting an exercise regimen. He noted that she had improvement of her headaches with Topamax. (Tr. 1000-1001).

On July 30, 2007, plaintiff complained of continuing headaches. He recommneded a follow-up MRI as a CT of the brain that was performed on July 27, 2007 suggested a possible aneurysm. He prescribed Nortriptyline. (Tr. 1010).

A MRI was performed at St. Elizabeth's Hospital in Belleville, Illinois, on August 3, 2007. This test was essentially normal and showed no aneurysm. (Tr. 979-980).

-8-

On September 24, 2007, Dr. Temporal noted that her headaches were slightly better with Nortriptyline and that her mood was improved. He reassured her that there was no aneurysm. Her mood and affect were described as normal, and her recent and remote memory were intact. There are no notes of complaints of back pain. (Tr. 1012).

Plainitff had improvement of her mood and sleep on Nortriptyline, but, by November 12, 2007, she had discontinued taking it because she was pregnant. She told Dr. Temporal that she was uncertan whether she wanted to continue with the preganacy. Her symptoms of depression and insomnia had returned. Dr. Temporal prescribed Wellbutrin. (Tr. 908).

On December 28, 2007, Dr. Temporal noted that plaintiff "felt better" on Wellbutrin. Her mood was stable and she was having no adverse effects. No complaints of headaches or back pain were noted. (Tr. 911).

By February 25, 2008, plaintiff had lost the pregnancy due to fetal abnormality. She was seen by Dr. Nalagan of Belleville Family Practice on that date, and was described as depressed and "taking it very hard." However, she was again taking Nortriptyline, prescribed by her eye doctor, which had improved her headaches. Dr. Nalagan increased the dosage of Nortriptyline and referred her for counseling to help her cope with the loss of her baby. (Tr. 913).

5.   **Medical Source Statements - Physical**

Dr. Greuloch completed a medical source statement in January, 2006. He did not fill out the form completely. He only stated that she had neurologic disease which caused headaches and visual blackouts. He also said that she was in treatment, but it could take months or years to stabilize her condition. (Tr. 855-856).

Dr. Kinsella completed a medical source statement in February, 2006. He indicated that she could frequently lift 10 pounds, stand or walk for a total of 4 to 5 hours a day but only for 15

minutes at a time, and sit for a total of 3 hours a day but only for 20-30 minutes at a time.  He further indicated that she would occasionally kneel, crouch, and bend, but she could never stoop.  He stated that plaintiff had severe low back pain and blurred vision and headache due to pseudotumor cerebri.  (Tr 853-854).

Dr. Temporal completed a medical source statement on April 24, 2008.  He limited plaintiff to sitting for 2 hours out of 8, standing for 1 hour, and walking for 1 hour.  He indicated that she could frequently lift 10 pounds and occasionally lift 20 pounds.  She had no visual or communicative limitations, and no manipulative limitations of her hands.  She was not limited in balancing, and could occasionally reach above her head and stoop.  She was said to have an impairment which could be expected to produce pain, but the doctor did not identify the impairment.  He checked boxes indicating that she had pain all day on a daily basis, and she had objective indications of muscle spasm and reduced range of motion.  He also indicated that she would need to take hourly breaks for back pain relief, and that her limitations have existed since 2006. (Tr. 1066-1069).

**6.     Medical Source Statements - Mental**

Dr. Temporal completed a mental medical source statement on April 24, 2008.  (Tr. 1070-1074).  He filled out a form on which he noted moderate or marked limitations in numerous areas of functioning, and stated she had one or two episodes of decompensation which had lasted longer than two weeks.  No details were offered.  His diagnosis was depression.  (Tr. 1074).

**7.     MRI Examinations**

On February 20, 2006, an MRI of the lumbar spine showed mild broad-based central disc bulges at L4-L5 and L5-S1 with no evidence of stenosis or disc desiccation.  (Tr. 252).

**8.     Consultative examination**

Dr. Vittal Chapa performed a consultative examination on January 26, 2008. His report is at Tr. 1022-1025. He indicated that plaintiff said she had "constant headaches." There is no mention of back pain. The examination was "essentially unremarkable." (Tr. 1025). Plaintiff had no paravertebral muscle spasm. There was no motor weakness or muscle atrophy. Her hand grip was 5/5 on both sides. The flexion of her lumbosacral spine was normal, and she had a full range of motion of the hips and knees. The straight leg raising test was negative on both sides. (Tr. 1024).

Dr. Chapa noted described plaintiff as "alert and oriented x 3." She did not have any delusions or hallucinations, was able to answer questions appropriately, and was in good contact with reality. (Tr. 1023).

**9.** **State agency physician reports**

There are no state agency physician reports in the record.

**Applicable Standards**

To qualify for disability insurance benefits or for supplemental security income benefits, a claimant must be "disabled." In this context, "disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is

severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and that she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether Ms. Tolliver-Cromwell is, in fact, disabled, but whether ALJ O'Blennis' findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing** ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  ***Richardson v. Perales*, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).**

## Analysis

Here, the ALJ properly followed the five step analysis. He concluded that plaintiff does have severe impairments of pseudotumor cerebri, migraine headaches, lumbar disc bulges, depression, and obesity, and that these impairments do not meet or equal a listed impairment. (Tr. 17). Ms. Tolliver-Cromwell does not challenge the finding that her condition does not meet or equal a listed impairment.

The ALJ also found that plaintiff's testimony about the intensity, persistence, and limiting effects of her symptoms is not completely credible. (Tr. 19). Plaintiff does not challenge this credibility finding.

Dr. Temporal's medical source statement, which listed "significant limitation," was afforded "little weight" because of inconsistencies between his assessment and the medical evidence. (Tr. 21). For the same reason, Dr. Temporal's mental medical source statement from April, 2008, was also given little weight. (Tr. 21-22).

The ALJ determined that plaintiff has the RFC to perform light work (frequently lift 10 pounds, occasionally lift 20 pounds, and a "good deal of walking or standing," 20 C.F.R. §404.1567(b)), with limitations of no work at heights or overhead work. The ALJ also found that she is mentally limited to performing simple, repetitive work with no teamwork or close interaction with coworkers. (Tr. 18).

Plaintiff was found to be unable to perform her relevant past work. However, considering her age, education, work experience, and RFC, the ALJ found that there are jobs in significant numbers in the relevant economy which Ms. Tolliver-Cromwell can perform.

The ALJ accepted the VE's testimony and found that plaintiff was able to perform the jobs of janitorial work, file clerk and cafeteria helper. (Tr. 23-24). If her RFC were reduced to a sedentary level with the same nonexertional limitations, she would again be able to perform jobs which exist in significant numbers. (Tr. 24).

Plaintiff's first point is that the ALJ erred in determining that plaintiff had the RFC to perform a limited range of light work. Plaintiff argues that there is no medical evidence to support this RFC and that the ALJ failed to set forth a sufficient narrative discussion.

Plaintiff cites Social Security Ruling 96-8p, which requires that the "RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."[2]

Plaintiff correctly points out that the record does not include an assessment of RFC by a state agency physician, and that the ALJ's assessment of RFC does not match the assessment of any of the doctors**. See, Doc. 12, p. 18.** This is not a fatal flaw. No regulation or Social Security Ruling requires an ALJ to adopt a doctor's assessment presented in the record. On the contrary, the Ruling cited by plaintiff instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, etc. SSR96-8p, at *5, emphasis in original.

The assessment of RFC is an issue which is reserved to the Commissioner. 20 C.F.R. 404.1527(e); SSR 96-5p, at *2. Pursuant to Section 404.1527(e)(2), the Commissioner considers evidence from medical sources in determining RFC, but "the final responsibility for deciding these issues is reserved to the Commissioner." Therefore, the Court rejects plaintiff's complaint that the ALJ's RFC assessment is not consistent with the assessment of any of the doctors.

---

[2]Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, **169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**. They do not, however, "have the force of law or properly promulgated notice and comment regulations." *Lauer, id.*

Plaintiff suggests that the ALJ's determination of her RFC is flawed because it is unsupported by the medical evidence and because the decision did not contain a narrative discussion, as required by SSR 96-8p.

On the contrary, ALJ O'Blennis included a thorough narrative discussion of the evidence and his thought processes in determining plaintiff's RFC.  See, Tr. 18-23.  He discussed plaintiff's testimony regarding her impairments and limitations.  He noted that she testified that she claimed disability due to headaches caused by pseudotumor cerebri and back pain caused by two herniated discs.  (Tr. 18).  She claimed that she has headaches 2 or 3 times a week, which last from 2 to 6 hours, with pain rated at a 10 on a scale of 1 to 10.  She also claimed that her back pain limits her ability to sit, stand, walk, and do activities of daily living.  (Tr. 18-19).  In addition, she testified that her depression was not relieved by medication.  (Tr. 19).

The ALJ compared plaintiff's testimony to the other evidence in the record.  She claimed to have two herniated discs, but a lumbar MRI showed only broad-based bulges at L4-L5 and L5-S1.  (Tr. 21).

The Court notes that the only citation to evidence of herniated discs in plaintiff's brief is at **Doc. 12, page 9, paragraph 47.**  Plaintiff says that Dr. Chung, a neuro-ophthalmologist, "noted the presence of two herniated discs," citing to Tr. 1053, 1055.  In fact, Dr. Chung noted that plaintiff told her that she had two herniated discs.  Dr. Chung performed no testing that would have revealed herniation of lumbar discs.  See, Tr. 1052-1061.

The ALJ noted that the record contains no indications of reflex, motor, or sensory loss, and that plaintiff's doctors "have provided little or no treatment for back pain."  (Tr. 21).  Dr. Kinsella documented complaints of back pain, but thought this was pregnancy related.  (Tr. 19). Further, plaintiff denied that any of her doctors had told her to exercise, but the record reflects that she was advised to lose weight and to exercise, and that exercise would help her back.  (Tr.

21). The ALJ concluded that "there is no indication that the claimant has taken weight loss or exercise seriously and one could reasonably conclude that if she was experiencing incapacitating pain as she has alleged, she would be more motivated in this area." (Tr. 21).

Regarding her headaches and vision problems associated with pseudotumor cerebri, the ALJ noted that the medical records indicate that her headaches were improved with prescription medication, and that the headaches were attributed to chronic overuse of over-the-counter pain relievers. Dr. Kinsella repeatedly instructed plaintiff to discontinue using Tylenol. (Tr. 19). Further, although plaintiff reported to Dr. Greuloch in November, 2006, that she was having daily migrainous-type headaches with photophobia, her visual examination was normal and he concluded that her "pseudotumor was not active ophthalmologically." (Tr. 19). Her vision was noted to be normal except for camera flash spots in June, 2007. (Tr. 19).

In addition, the ALJ discussed the treatment records of Dr. Sophia Chung, who is a neuro-ophthalmologist. In a note dated February 21, 2008, Dr. Chung described an examination that yielded normal results except for "bilateral disc edema in the face of a normal MRI scan." (Tr.20). The ALJ found it significant that Dr. Chung elected to treat her medically instead of surgically.

Finally, the ALJ considered and discussed the third party accounts of plaintiff's husband and friend, her own account of her daily activities, and the fact that she had applied for unemployment compensation. (Tr. 22).

The ALJ explained the basis for the functional limitations that he found: the record established no visual limitations; lifting restrictions were due to her weight, as there is little evidence to substantiate complaints of significant back pain; limitations on working at heights were due to her headaches; social limitations were "precautionary" and assigned due to her history of headaches and depression. (Tr. 23).

Based on all of the above factors, this Court concludes that the ALJ properly weighed the evidence and did not err in assessing RFC. Further, his narrative discussion of RFC was more than adequate.

Plaintiff also argues that the ALJ erred in the weight he accorded to the opinions of Drs. Temporal and Kinsella. She cites to 20 C.F.R. §416.927(d), and suggests that the opinions of Drs. Temporal and Kinsella should be given more weight because they were treating sources. A close reading of plaintiff's argument, however, reveals that she misunderstands Section 416.927(d).

The opinions of treating doctors "on the nature and severity of your impairment(s)" may be given controlling weight under Section 416.927(d). However, medical opinions of treating doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §416.927(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2.

In her brief, plaintiff specifically argues that the ALJ erred in not according controlling weight or special significance to the medical source statements regarding RFC. **See, Doc. 12, pp. 18-19.** However, because the assessment of RFC is an issue which is reserved to the Commissioner, 20 C.F.R. 404.1527(e), the ALJ can not be faulted for failing to accord controlling weight or special significance to the RFC assessments offered by the treating sources.

For her last point, plaintiff argues that the Commissioner should have considered a mental medical source statement from Dr. Nalagan, submitted after the ALJ had already denied

the application.  The statement was dated June 13, 2008, but was not submitted to the ALJ until July 22, 2008.  (Tr. 1095-1101).  ALJ O'Blennis declined to consider the statement because it was not submitted until after his decision denying benefits was issued and mailed on July 21, 2008.  (Tr. 1101).

Evidence that was submitted after the ALJ had rendered a decision was obviously not considered by the ALJ.  Therefore, that evidence cannot be considered by this Court on the question of whether the ALJ's decision was supported by substantial evidence.  ***Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817-818 (7th Cir. 1993).**  Dr. Nalagan's report can only be considered by this Court on the question of whether to remand the case for further consideration pursuant to sentence six of 42 U.S.C. §405(g).

Pursuant to 42 U.S.C. §405(g), the Court can order a sentence six remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...."

Defendant argues, correctly, that Dr. Nalagan's report is not "new evidence."  As of the time of the hearing on May 20, 2008, the report had not yet been written.  However, while the report was dated June 13, 2008, it was based on evidence that was available prior to the hearing.  Dr. Nalagan, who practices with Dr. Temporal, saw plaintiff for depression in February, 2008.  (Tr. 913).  The report does not indicate that it was based on any new data or new examination.

In this context, "new evidence" is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding."  ***Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993) (citing *Sullivan v. Finkelstein,* 626, 110 S.Ct. 2658, 2664 (1990)).**  A report that was not yet written at the time of the hearing, but which was based on information that was available, is not "new evidence" for purposes of a sentence six remand.  ***Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).**

Further, Dr. Nalagan's report is not material. Plaintiff agrees that the report is material only if there is a "reasonable probability" that the ALJ would have reached a different conclusion if he had considered it. **See, Doc. 12, p. 20.** There is no such reasonable probability here. The ALJ rejected a similar mental assessment by Dr. Nalagan's associate, Dr. Temporal. The ALJ specifically found Dr. Temporal's assessment to be not credible because it stated that plaintiff had experienced one or two episodes of decompensation, but there was no evidence of same in the record. (Tr. 21). Dr. Nalagan's assessment says that plaintiff experienced three episodes of decompensation that lasted at least two weeks. (Tr. 1099). Because there is no evidence of such episodes of decompensation in the record, the reasonable probability is that the ALJ would have rejected Dr. Nalagan's assessment just as he rejected the assessment of Dr. Temporal.

Lastly, plaintiff has not made a showing of good cause for failing to submit Dr. Nalagan's assessment before the ALJ rendered his decision. Plaintiff's brief does not even attempt to make such a showing.

## Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, this Court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff Kennika Tolliver-Cromwell is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **July 12, 2010.**

**Submitted: June 23, 2010.**

        **s/ Clifford J. Proud**
        **CLIFFORD J. PROUD**
        **UNITED STATES MAGISTRATE JUDGE**